COUNTRY MUTUAL INSURANCE COMPANY, Plaintiff-Appellee and Counterdefendant-Appellee, v. THOMAS OLSAK *et al.*, Defendants-Appellants and Counterplaintiffs-Appellants (Fremd High School Hockey Club *et al.*, Defendants).

First District (3rd Division)     No. 1—07—2273

Opinion filed May 13, 2009.

Norman J. Lerum, of Norman J. Lerum, P.C., of Chicago, and James M. Messineo, of James M. Messineo & Associates, of Inverness, for appellants.

Keith G. Carlson, of Carlson Law Offices, and Brian Schroeder, of Cassiday, Schade & Gloor, LLP, both of Chicago, for appellee.

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

Plaintiff, Country Mutual Insurance Company, filed a complaint for declaratory judgment seeking a determination of whether it owed defendant, Thomas Olsak, a duty to defend or indemnify him in underlying litigation. The underlying complaint alleged that Olsak, a 17-year-old hockey player, committed battery when he punched Joseph Pecoraro, his coach, in the head during an altercation. Pecoraro settled his claims with Olsak; as part of the settlement, Olsak assigned Pecoraro his rights under two Country Mutual insurance policies issued to Olsak's mother and stepfather. The trial court found that plaintiff did not have a duty to defend Olsak against the claims in the underlying suit because he committed an intentional act. On appeal, Olsak and Pecoraro contend that plaintiff had a duty to defend Olsak in the underlying suit and that plaintiff breached its duty of fair dealing.

# I. BACKGROUND

Joseph Pecoraro was severely injured during the confrontation with Olsak. Pecoraro brought suit against Olsak and named as respondents in discovery the Fremd High School Hockey Club, individual members of the hockey club's board of governors, of which Ed Pudlo, Olsak's stepfather, was a member, and Pudlo individually. On July 19, 2001, the respondents in discovery were converted to defendants.

The second amended complaint alleged that on October 21, 1998, Pecoraro was the head coach of the hockey club's varsity team and Olsak was a 17-year-old player. Olsak had deliberately missed two consecutive conditioning sessions earlier in the week, in violation of team practice rules, so he knew he would not be allowed to play in the game that night. However, he reported to the locker room and dressed in his hockey equipment for the purpose of triggering a confrontation with Pecoraro. When Pecoraro entered the locker room, a verbal confrontation ensued, and when Pecoraro walked away, Olsak followed and threw a hockey stick at his back. As Pecoraro turned around, Olsak struck him in the temple. Pecoraro stiffened and fell backwards, striking his head on the concrete floor. He suffered serious head injuries, was in a coma for several days, and sustained permanent brain damage, including the loss of certain sensory and cognitive functions. According to the complaint, Pecoraro did not strike or touch Olsak, and Olsak did not strike him in self-defense.

The complaint alleged that Pudlo was a manager of the team and member of the hockey club's board of governors. He knew that Olsak had received disciplinary action in school in March 1998 for breaking a ceiling tile by hitting it with his hand and for "destructive, dangerous, and disruptive behavior after repeated warnings" in the classroom. The board also knew, through Pudlo or other "individual defendant members of the Board," that in late February or early March 1998, Olsak was assessed a major penalty for assaulting and fighting a player on the opposing team during a game. It knew, through the individual board defendants, that Olsak received an inordinately high number of penalty minutes during the 1997-98 season for violating playing rules promulgated by USA Hockey and that he had made disrespectful and combative comments to Pecoraro and other assistant coaches on several occasions before the incident in question.

It was alleged that the hockey club and individual board members breached their duty to Pecoraro by failing to, *inter alia,* (1) define, implement, and execute policies relating to the enforcement of team rules that were to be followed by the players; (2) prevent Olsak from dressing in his hockey equipment on October 21, 1998; (3) define and

implement policies and procedures that would have required Edward Pudlo, the manager, to serve as a liaison between the coaches and players to prevent abusive contact toward coaches; (4) hold a disciplinary hearing and investigate the incidents of violent behavior demonstrated by Olsak to prevent further acts of violence, intimidation, or abuse; and (5) discipline or suspend Olsak from hockey before October 21, 1998. The second amended complaint alleged that the failure of the board and its individual members to effectively manage and control Olsak caused Pecoraro's injuries.

Count I of the complaint alleged assault and battery against Olsak. Count II alleged that the Fremd High School Hockey Club and individual members of the hockey club's board of governors, including Pudlo, were negligent when they failed to control Olsak. Count III alleged negligent parental supervision against Pudlo individually.

Olsak filed an answer denying the allegations of the underlying complaint. In October 2001, he filed an affirmative defense alleging that Pecoraro instigated the altercation and provoked him. In June 2003, he filed an additional affirmative defense alleging that Pecoraro approached Olsak, who "felt threatened and perceived imminent harm." This defense was based on Olsak's deposition, wherein he denied acting intentionally; he stated that he "snapped" or "had a mental lapse" after Pecoraro insulted him and his family.

Count III was dismissed with prejudice on March 13, 2002. On April 8, 2003, the hockey club and individual members of the board of governors filed a cross-claim against Olsak seeking contribution.

In 2003, the hockey club and board members filed a motion for summary judgment on count II of the complaint, arguing that they did not have a duty to control Olsak's conduct because there was not a special relationship between them and Olsak and that they did not have a duty to protect plaintiff from Olsak's unforeseeable, criminal attack. In response to the motion for summary judgment and in support of his own motion for partial summary judgment, Olsak argued that a master-servant relationship existed between the board and Olsak. In October 2005, the trial court dismissed the individual board member defendants from the underlying litigation.[1]

## B. Declaratory Judgment Action

Country Mutual issued a homeowner's policy to Ed Pudlo and a personal and professional umbrella liability policy to Ed Pudlo and Olsak's mother, Desiree Pudlo. The homeowner's policy provided that the "insured" includes "you and the following residents of your

---

[1]This court affirmed the dismissal of the individual board defendants on June 19, 2008. See *Pecoraro v. Balkonis*, 383 Ill. App. 3d 1028 (2008).

household: 1. your relatives and 2. persons under 21 under the care of those named above." It further provided, "We promise to pay on behalf of an insured for damages resulting from bodily injury or property damage caused by an occurrence, if the insured is legally obligated." The policy defined an "occurrence" as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The policy also provided that bodily injury or property damage "caused intentionally by or at the direction of the insured" was excluded from coverage.

The umbrella policy defined "insured" as the named insured and "any relative or, if residents of the named insured's household, any other person under the age of twenty-one in the care of the named insured." It provided that Country Mutual "agrees to indemnify the insured for ultimate net loss in excess of the retained limit which the insured shall become legally obligated to pay *** as damages because of personal injury or property damage." It defined "personal injury" as "assault and battery not committed by or at the direction of the insured, unless committed *** for the purpose of protecting persons or property, including death resulting therefrom, sustained by any person." However, coverage was excluded for "any act committed by or at the direction of the insured with intent to cause personal injury or property damage."

In October 2000, Country Mutual issued Olsak a notice of denial of coverage on the basis that the allegations of the underlying complaint did not fall under the policies' definition of "occurrence" and that the intentional-acts exclusion applied. The board's insurer hired an attorney to represent the board, of which Ed Pudlo was a member. Country Mutual hired the Shipley Law Group to additionally represent Pudlo as a board member. Country Mutual also hired Chilton Yambert to represent Pudlo individually for the negligent parental supervision claim. In February 2005, Country Mutual filed a declaratory judgment action seeking a declaration that it was not required to defend or indemnify Olsak in the *Pecoraro* lawsuit. The complaint for declaratory judgment alleged the hockey club filed a cross-claim for contribution against Olsak in the underlying case, "which was never previously tendered to Country Mutual for defense or indemnification and was only recently obtained by Country Mutual."[2] Furthermore, Country Mutual's response to defendants' first request for production of documents claimed that "Olsak did not make a request directly to

---

[2]At the June 13, 2007, hearing, counsel for plaintiff stated that "there was a forwarding" in December 2004 of the cross-claim.

Country Mutual to reconsider any decision on defense. The only request for reconsideration Country Mutual is aware of was made in the presence of its counsel in the chambers of Judge Elrod" on May 23, 2005, during proceedings in the underlying litigation.

Pecoraro settled his assault and battery claim against Olsak in June 2006. The settlement agreement provided that Olsak would pay Pecoraro $5,000 and assign Pecoraro all of his rights under the two Country Mutual insurance policies issued to Olsak's mother and stepfather. The settlement agreement stated that Olsak, who did not have "any substantial assets with which to pay any judgment or settlement" to Pecoraro, had potential claims against County Mutual for denying him a defense.[3]

Pursuant to the terms of the settlement agreement, Pecoraro's counsel assumed the representation of Olsak. Counsel filed second amended affirmative defenses to Country Mutual's complaint for declaratory judgment and a counterclaim against Country Mutual for bad-faith refusal and for violation of section 155 of the Insurance Code (215 ILCS 5/155 (West 2004)).

The affirmative defenses and counterclaim alleged that Country Mutual only maintained one file on, and had one adjuster assigned to, the incident alleged in the underlying complaint. They also alleged that Country Mutual made "false statements" in its denial letter, including a citation to a section of the policy that did not exist and different dates on each of its three pages. Furthermore, Country Mutual only "reviewed, considered or relied on" the complaint, the recorded statement of Ed Pudlo, and the initial investigatory materials in deciding whether Olsak was entitled to a defense, but it did not obtain a statement from Olsak. Therefore, defendants alleged, Country Mutual failed to perform a complete investigation of the facts relating to whether Olsak should receive a defense in the underlying action.

In addition, the affirmative defenses and counterclaim alleged that Olsak was left to defend himself with limited funds for five years, during which time Country Mutual failed to file a declaratory judgment action. Olsak was only able to obtain representation in the underlying litigation by using his own savings and the "limited financial assistance" provided by his mother and stepfather. The attorney that was retained to defend Olsak was from Chilton Yambert, the same law firm that was initially retained at Country Mutual's expense to defend

---

[3]On June 19, 2008, this court also affirmed the trial court's finding that the settlement agreement was in good faith. See *Pecoraro*, 383 Ill. App. 3d 1028. The settlement agreement was purportedly in accord with *Guillen v. Potomac Insurance Co. of Illinois*, 203 Ill. 2d 141 (2003).

the Pudlos. That firm withdrew on October 8, 2004, leaving Olsak unrepresented. Olsak represented himself *pro se* in the underlying litigation from October 2004 until June 2006, when he reached the settlement with Pecoraro.

Defendants further alleged that Country Mutual also accepted the defense of Pudlo in connection with the claims alleged against him as a member of the board of governors as a potential excess carrier that may be responsible for any judgment against him that exceeds the primary coverage afforded under the board's insurance. Because Country Mutual accepted the defense of Ed Pudlo, Olsak's stepfather, it received reports from counsel and was, therefore, monitoring the underlying action.

Country Mutual filed a motion for summary judgment on its complaint, a motion to dismiss the second amended affirmative defenses, and a motion for summary judgment on the counterclaim. The trial court dismissed with prejudice the second amended affirmative defenses, granted Country Mutual summary judgment on its complaint, and declared that Country Mutual had no duty to defend or indemnify Olsak. The trial court also granted Country Mutual summary judgment on Olsak's counterclaim. This appeal followed.

## II. ANALYSIS

### A. Dismissal of Complaint, Counterclaim, and Affirmative Defenses

Defendants contend that the trial court erred in granting summary judgment on their counterclaim and Country Mutual's complaint and dismissing their second amended affirmative defenses. According to defendants, plaintiff was faced with a conflict of interest when it participated in a defense strategy on behalf of Ed Pudlo that furthered its own interest in excluding coverage and denying a defense to Olsak. Therefore, defendants argue, Country Mutual should have paid for independent counsel to defend Olsak.

Summary judgment is appropriate when the pleadings, depositions, and other evidence reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 2004). Summary judgment is a drastic means of resolving litigation and should only be allowed when the right of the moving party is clear and free from doubt. *Bier v. Leanna Lakeside Property Ass'n*, 305 Ill. App. 3d 45, 50 (1999).

A motion to dismiss pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2004)) attacks the legal sufficiency of the complaint. *DOD Technologies v. Mesirow Insurance Services, Inc.*, 381 Ill. App. 3d 1042, 1045 (2008), citing *R&B Kapital*

*Development, LLC v. North Shore Community Bank & Trust Co.*, 358 Ill. App. 3d 912, 920 (2005). A court reviewing an order granting a section 2—615 motion takes all well-pled facts as true. *DOD Technologies*, 381 Ill. App. 3d at 1046. " 'On review of a section 2—615 dismissal, the reviewing court must determine whether the allegations of the complaint, when interpreted in [the] light most favorable to the plaintiff, sufficiently set forth a cause of action on which relief may be granted.' " *DOD Technologies*, 381 Ill. App. 3d at 1046, quoting *R&B*, 358 Ill. App. 3d at 920.

We review both a grant of summary judgment and a dismissal pursuant to section 2—615 *de novo. Collins v. Superior Air-Ground Ambulance Service, Inc.*, 338 Ill. App. 3d 812, 815 (2003); *Woods v. Pence*, 303 Ill. App. 3d 573, 576 (1999).

An insurer's duty to defend is generally determined by comparing the allegations of the underlying complaint against the insured to the language of the insurance policy. *American Country Insurance Co. v. James McHugh Construction Co.*, 344 Ill. App. 3d 960, 970 (2003). If the facts alleged in the underlying complaint fall even potentially within the policy's coverage, the insurer is obligated to defend its insured, even if the allegations are groundless, false, or fraudulent. *James McHugh Construction Co.*, 344 Ill. App. 3d at 970. Because the insurer's duty to defend is broader than the duty to indemnify, it may be obligated to defend against causes of action and theories of recovery that are not in fact covered by the policy. *Illinois Masonic Medical Center v. Turegum Insurance Co.*, 168 Ill. App. 3d 158, 162 (1988). "In those circumstances, the insurer may choose to defend under a reservation of rights or seek a declaratory judgment that there is no coverage; otherwise, it will be estopped from raising the defense of noncoverage in a subsequent action between it and the insured." *Illinois Masonic Medical Center*, 168 Ill. App. 3d at 162.

■ When there is a conflict of interest between an insurer and the insured, instead of participating in the defense itself, the insurer must decline to defend and pay the costs of independent counsel for the insured. *Illinois Masonic Medical Center*, 168 Ill. App. 3d at 163. The test of whether a conflict exists is if, in comparing the allegations of the complaint to the terms of the policy, the insurer's interests would be furthered by providing a less-than-vigorous defense to the allegations. *Williams v. American Country Insurance Co.*, 359 Ill. App. 3d 128, 138 (2005). An insurer's interest in negating policy coverage does not, in and of itself, give rise to a conflict of interest. *Royal Insurance Co. v. Process Design Associates, Inc.*, 221 Ill. App. 3d 966, 976 (1991). A conflict may be resolved by full disclosure and consent of the parties. *Nandorf, Inc. v. CNA Insurance Cos.*, 134 Ill. App. 3d 134, 137 (1985).

In *Murphy v. Urso*, 88 Ill. 2d 444 (1981), a bus driver took a van after school hours for personal use and was involved in an accident that injured his passenger. The passenger sued the driver of the van and the school that employed him. The driver did not respond to the complaint, so a default judgment was entered against him. The plaintiff filed a garnishment suit seeking payment from the owner's insurance company. The insurer attempted to deny coverage of the driver, but the plaintiff argued that it was estopped from denying coverage because it had failed to defend the driver in the underlying suit.

Our supreme court ruled that the insurance company had conflicts of interest preventing it from defending under a reservation of rights where it controlled both defenses for the school and the driver. *Murphy*, 88 Ill. 2d at 453.

> "To best defend the preschool, it would try to show that [the driver] did not have permission to use the bus at the time of the accident. *** This would sever any connection between the preschool and [the driver], place all the liability on [the dirver], and exonerate the school. But to best serve [the driver], Travelers had to try to show that he did have permission to use the bus. This would spread the liability to the schools." *Murphy*, 88 Ill. 2d at 453.

The interests of the schools and the driver were "diametrically opposed, creating an ethical conflict for Travelers, which was charged with providing a full and vigorous defense to each." *Murphy*, 88 Ill. 2d at 453. "In order to defend either the schools or [the driver], Travelers had to resolve the conflict and pick a strategy of defense. How could it do so for one without harming the other?" *Murphy*, 88 Ill. 2d at 453.

Similarly, in *Williams v. American Country Insurance Co.*, 359 Ill. App. 3d 128 (2005), the plaintiff, a police officer, approached a cab, opened the door, and leaned inside. While the plaintiff was leaning inside the cab, the driver began driving, forcing the plaintiff to run alongside the cab for 15 feet. The driver was charged with and convicted of misdemeanor battery.

The officer filed a civil suit against the driver and the company that owned the cab, Yellow Cab Company, alleging that the driver was the agent and servant of Yellow Cab. It alleged negligence against both defendants and negligent entrustment against Yellow Cab. The insurer of both the driver and Yellow Cab undertook the defense of the personal injury case, retaining one firm to represent Yellow Cab and another to represent the driver. In its answer to the officer's complaint, Yellow Cab denied that the driver was an agent. While that case was pending, the driver filed suit seeking a declaration that his insurer

was obligated to provide him with independent counsel because of a conflict of interest.

This court found that a conflict of interest existed, as the insurer "was charged with providing a full and vigorous defense" to both the cab company and the driver, whose interests in the underlying suit were in opposition to each other. *Williams*, 359 Ill. App. 3d at 138. It was in the driver's best interest to present a defense that he was an agent of the company, while it was in the company's best interest to establish the exact opposite. *Williams*, 359 Ill. App. 3d at 139. Because the interests of the driver and the cab company were "diametrically opposed," the insurer was presented with "an ethical conflict where it could not choose a defense strategy in the underlying action without harming either Williams or Yellow Cab." *Williams*, 359 Ill. App. 3d at 139.

Country Mutual contends that *Williams* is inapplicable because, unlike the insurance company in *Williams*, it did not defend both Olsak and Pudlo. We disagree. Like the insurers in *Williams* and *Murphy*, Country Mutual was charged with providing a "full and vigorous defense" to both Ed Pudlo and Olsak, whose interests were opposed. It was in Pudlo's best interest in the underlying litigation to argue that Olsak acted with the intent to deliberately injure Pecoraro and that the altercation was an isolated act of violence that fell outside a master-servant relationship between Olsak, as a high school hockey player, and the hockey club and Pudlo, as an agent and board member. Indeed, the hockey club and board members filed an affirmative defense in the underlying litigation alleging that Olsak's acts were the sole proximate cause of Pecoraro's injuries. They also filed a motion for summary judgment on count II of the complaint, arguing that they did not have a duty to control Olsak's conduct because there was not a special relationship between them and Olsak and that they did not have a duty to protect Pecoraro from Olsak's unforeseeable, criminal attack.

On the other hand, it was in Olsak's best interest to argue that he did not act intentionally, that he was provoked or acted in self-defense, as his affirmative defense alleged, and that he did not receive adequate discipline or management from Pudlo and the other members of the board. A vigorous defense for either one would support the allegations made by Pecoraro against the other co-insured.

The interests of Olsak and Pudlo were thus diametrically opposed and presented Country Mutual with an ethical conflict where it could not choose a defense strategy in the underlying litigation without harming either Pudlo or Olsak. See *Williams*, 359 Ill. App. 3d at 139. The evidence in this case shows that Country Mutual failed to disclose

this conflict to Olsak and obtain his consent, as required by *Nandorf*, 134 Ill. App. 3d at 137.

Country Mutual argues that there is no conflict because it had no duty to defend Olsak in the first instance in light of his intentional conduct. It contends that if this court determines that there was no duty to defend, then its failure to advise Olsak of the alleged conflict and pay for independent counsel to defend him in the underlying litigation is irrelevant.

For the insurer to justifiably refuse to defend the insured, it must be " 'clear from the face of the underlying complaints that the allegations fail to state facts' " that bring the cause within or potentially within coverage. *Atlantic Mutual Insurance Co. v. American Academy of Orthopaedic Surgeons*, 315 Ill. App. 3d 552, 559 (2000), quoting *United States Fidelity & Guaranty Co. v. Wilkin Insurance Co.*, 144 Ill. 2d 64, 73 (1991). Furthermore, if an insurer relies on an exclusionary provision, it must be "clear and free from doubt" that the policy's exclusion prevents coverage. *Bituminous Casualty Corp. v. Fulkerson*, 212 Ill. App. 3d 556, 564 (1991). The court must liberally construe the underlying complaint and the insurance policy in favor of the insured. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 74 (1991).

The homeowner's policy defines an "occurrence" as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The umbrella policy defines "personal injury" as "assault and battery not committed by or at the direction of the insured, unless committed *** for the purpose of protecting persons or property, including death resulting therefrom, sustained by any person." Coverage was excluded for "any act committed by or at the direction of the insured with intent to cause personal injury or property damage." Country Mutual cites the allegations of the underlying complaint that Olsak punched Pecoraro in the left temple "without legal justification, and with malicious intent to seriously injure," that Pecoraro did not strike or touch Olsak, and that Olsak's actions were not "in self-defense of any physical attack" by Pecoraro.

However, even in cases of criminal conduct, a potential for coverage has been found. In *Cowan v. Insurance Co. of North America*, 22 Ill. App. 3d 883 (1974), for example, the plaintiff had an altercation with a man, knocking him down and causing him to fracture his leg. The victim sued the plaintiff in the underlying action, alleging that the plaintiff violently assaulted him and that the assault was willful and malicious. The jury in the underlying action awarded him $8,000.

The plaintiff then brought a declaratory judgment action against his liability insurer to compel payment of the judgment. The complaint in the declaratory judgment action alleged that during the altercation, the plaintiff inadvertently came in contact with the victim, causing him to lose his balance and fall to the ground, and that the act causing the injury was unintended and accidental. The insurer argued that the doctrine of collateral estoppel prevented the plaintiff from relitigating the intentional injury issue in the declaratory judgment action.

This court held that to be absolved from liability under the policy exclusion, the insurance company had to demonstrate that the plaintiff specifically intended to injure the victim. *Cowan*, 22 Ill. App. 3d at 893. This court noted that "the gist of the action for battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff." *Cowan*, 22 Ill. App. 3d at 890. The jury was instructed that a willful and malicious assault occurred if the plaintiff intended the harm or displayed an utter indifference to or a conscious disregard for the safety of others. *Cowan*, 22 Ill. App. 3d at 894-95. Since the instruction was in the disjunctive, it could not be presumed that the jury actually decided the issue of an intentional injury. *Cowan*, 22 Ill. App. 3d at 895.

Additionally, in *Allstate Insurance Co. v. Kovar*, 363 Ill. App. 3d 493 (2006), the plaintiff alleged that one of the defendants had negligently waved a sharp object toward him, cutting him. The homeowner's insurance policy for one of the defendants contained an exclusion for injuries intended by, or that could reasonably be expected to result from, the intentional or criminal acts of the insured. The insurance company filed a complaint for declaratory judgment, arguing that the exclusion for intentional acts applied, because the defendant pled guilty to battery. Declining to address whether the exclusion applied, the court concluded that the conviction alone did not collaterally estop the insured and victim from arguing that the injury was negligently inflicted, as the insurance company failed to establish the threshold requirements of *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378 (2000), and the insured did not have an incentive to litigate the battery issue in the criminal case. *Kovar*, 363 Ill. App. 3d at 503, 504. See also *Talarico v. Dunlap*, 177 Ill. 2d 185 (1997) (collateral estoppel did not preclude patient who sued his doctor for prescribing a medication that allegedly caused him to assault two people from relitigating claim that medication caused him to engage in criminal conduct, as he did not have an incentive to litigate the issue in the criminal case); *Country Mutual Insurance Co. v. Hagan*, 298 Ill. App. 3d 495, 503 (1998) (holding that a court determining whether the intentional-injury exclusion applies for

sexual abuse should not infer intent when the perpetrator is also a minor because of "minors' relative lack of experience in sexual matters"); *Aetna Casualty & Surety Co. v. Dichtl*, 78 Ill. App. 3d 970 (1979) (insured's conduct of murdering her husband would not fall within the exclusion if she lacked the mental capacity necessary to form the intention to harm him or the expectation of his injury). Therefore, the allegations of the underlying complaint revealed a *potential* for coverage (*James McHugh Construction Co.*, 344 Ill. App. 3d at 970), and the trial court improperly granted summary judgment on defendants' counterclaim and Country Mutual's complaint and dismissed the second amended affirmative defenses.

*Allstate Insurance Co. v. Carioto*, 194 Ill. App. 3d 767 (1990), which Country Mutual cites in support of its argument that battery does not constitute an occurrence, supports our conclusion. We recognized in *Carioto* that a criminal conviction is "only *prima facie*, not conclusive, evidence of an insured's intent." *Carioto*, 194 Ill. App. 3d at 775. Furthermore, in *Carioto*, the insurance company filed a declaratory judgment action six months after the underlying complaint was amended to allege negligence. In *West American Insurance v. Vago*, 197 Ill. App. 3d 131 (1990), and *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill. App. 3d 617 (1980), there were no allegations that the insurance company waited 4.5 years to file a declaratory judgment action, as Country Mutual did here.

■ We conclude that the trial court erred when it granted summary judgment on Country Mutual's complaint and defendants' counterclaim and dismissed with prejudice the second amended affirmative defenses. Our analysis suggests that a conflict of interest existed between Olsak and Pudlo. This case must be remanded to the trial court to make the final determination and, if so, to determine whether Olsak was prejudiced by Country Mutual's failure to retain independent counsel to represent him. See *Royal Insurance Co.*, 221 Ill. App. 3d at 976 (prejudice resulting from a conflict of interest will not be presumed, and the burden of establishing it rests with the insured and must be proved by clear, concise, and unequivocal evidence).

## B. Motion to Compel Production of Documents

■ Defendants contend that the trial court abused its discretion by denying their motion to compel production of documents as untimely. A trial court has great latitude in ruling on discovery matters. *Mutlu v. State Farm Fire & Casualty Co.*, 337 Ill. App. 3d 420, 434 (2003). "Absent an abuse of discretion affirmatively and clearly shown by appellant, the trial court's order concerning discovery should not be disturbed on appeal." *Avery v. Sabbia*, 301 Ill. App. 3d 839, 844 (1998).

A May 3, 2006, order required, *inter alia*, that the parties have a Rule 201(k) (210 Ill. 2d R. 201(k)) conference within 14 days on any issues defendants had with Country Mutual's claims of privilege on documents withheld from production in response to Olsak's discovery requests. The order further required defendants to file a motion to compel with respect to such issues by May 31, 2006. Olsak did not file a motion to compel the production of documents until March 12, 2007. The trial court denied the motion as untimely.

Defendants argue that in light of the settlement agreement and substitution of new counsel on their behalf, the trial court abused its discretion "by relying on an order that did not pertain to substituted counsel for Pecoraro and Olsak." However, the motion to compel challenged privilege logs produced in September 2005, well before the deadline to file a motion to compel. In addition, Pecoraro settled his claim with Olsak on June 26, 2006, nine months before the deadline to file a motion to compel, and on September 27, 2006, the court permitted Olsak's current attorneys to substitute as counsel for Olsak. Where substituted counsel waited four months after the substitution to file the motion, we find that the trial court did not abuse its discretion.

Unlike *Western States Insurance Co. v. O'Hara*, 357 Ill. App. 3d 509 (2005), the case cited by defendants, defendants were given a specific date before which they were to file a motion to compel. Where the trial court set a firm deadline by which defendants "shall file any motion to compel" with respect to "any issues defendants have regarding claims of privilege" for the withheld documents and defendants did not file a motion until nine months after the deadline, we find that the trial court's denial of the motion was not an abuse of discretion.

## III. CONCLUSION

For the foregoing reasons, we find that the trial court erred in granting summary judgment on defendants' counterclaim and Country Mutual's complaint and dismissing their second amended affirmative defenses. We remand to the trial court to make a final determination as to whether a conflict of interest existed between Olsak and Pudlo, Country Mutual's co-insureds.

Reversed and remanded.

QUINN and COLEMAN, JJ., concur.